UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOLOCK CAPITAL, LLC and DBW INVESTMENTS, LLC,<br><br>                                Plaintiffs,<br><br>            v.<br><br>VNUE, INC.,<br><br>                                Defendant. | CIVIL ACTION NO. 1:21-cv-08103-DLC<br><br>**DEFENDANT'S FIRST AMENDED ANSWER AND COUNTERCLAIMS**<br><br>JURY TRIAL DEMANDED |
| VNUE, INC.,<br><br>                    Counterclaim Plaintiff,<br><br>            v.<br><br>GOLOCK CAPITAL, LLC, DBW INVESTMENTS, LLC, CROSSOVER CAPITAL FUND II, LLC, DAVID WHITLOCK, KENNETH LUSTIG, and CHRISTOPHER GOROG,<br><br>                    Counterclaim Defendants. | |

Defendant VNUE, Inc. ("VNUE" or "Defendant"), by their attorneys, as and for its Answer to the Amended Complaint ("Complaint") dated December 2, 2021 (ECF 10), filed by Plaintiffs Golock Capital, LLC ("GOLOCK") and DBW Investments, LLC ("DBW") (collectively "Plaintiffs"), states as follows.

As to the first paragraph of the Complaint (which is unnumbered), no response is required; if a response is required, the same is hereby denied.

The following paragraphs correspond numerically to the numbered paragraphs beginning on page one of the Complaint. The headings in the Complaint are reproduced here for the convenience of the Court.

## Nature of the Case

1.      Admitted that VNUE is a music technology company that records live concerts and sells that content to consumers, that Plaintiffs purchased seven convertible promissory notes ("Notes" or "Convertible Notes") from Defendant, that six of the Notes were twice amended, that a seventh note was issued subsequent to the amendments, and that the Notes constitute loans that were absolutely repayable by VNUE.  The remaining allegations of this paragraph are denied.

2.      The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

3.      The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

4.      Denied that Defendant defaulted on the payment of principal and interest.  The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

5.      The first sentence of this paragraph is admitted.  The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

## Parties

6.      Admitted upon information and belief.

7.      Admitted upon information and belief.

8.      Admitted.

## Jurisdiction and Venue

9.     Admitted upon information and belief.

10.     The first sentence of this paragraph is admitted.   The second sentence of this paragraph is denied because the Notes were made in violation of the federal securities laws and New York's usury laws.

## Allegations Common to All Claims

### The Five Notes Held by GOLOCK

11.     Admitted that GOLOCK is the holder of five of the Notes.   The remaining allegations of this paragraph, including subparagraphs a., b., c., d., and e. thereof, characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

12.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

13.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

14.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

15.     Denied.

16.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

17.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

18.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

19.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

**The Two Notes Held by DBW**

20.     Admitted that DBW is the holder of two of the Notes.  The remaining allegations of this paragraph, including subparagraphs a. and b. thereof, characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

21.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

22.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

23.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

24.     Denied.

25.     The allegations of this paragraph characterize the contents of a document; the

document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

26.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

27.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

28.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

**Payment of the Notes and Accrued Interest**

29.     Admitted.

**Conversion of the Notes and Accrued Interest into Common Stock**

30.     As to the first sentence of this paragraph, admitted that Plaintiff Golock exercised its conversion rights under the Notes on five occasions; Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence, and, on that basis, denies each and every allegation contained therein.  As to the second sentence of this paragraph, admitted that the total amount of the five conversions was $24,387.50; the remaining allegations of this sentence are denied.

31.     Admitted that Plaintiff Golock issued a sixth notice of conversion; Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

32.     Admitted that Defendant did not issue shares under the sixth notice of conversion. The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

33.     Admitted that Defendant informed Plaintiffs that no shares would be made available to satisfy any additional notices of conversions that Plaintiffs might submit.   The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

34.     Admitted upon information and belief.

35.     Admitted that Defendant did not issue the shares required by the Seventh Notice of Conversion.   The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

36.     Admitted that in or about June 2021, Defendant obtained a legal opinion, and that Zach Bair, CEO and Chairman of VNUE, communicated to Plaintiffs that future notices of conversion would not be honored.   The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

37.     Admitted that in or about June 2021, Defendant obtained a legal opinion, and that Zach Bair, CEO and Chairman of VNUE, communicated to Plaintiffs that future notices of conversion would not be honored.   The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

**Stock Purchase Warrants**

38.     The allegations of this paragraph characterize the contents of a document; the

6

document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

39.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

40.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiffs prepared the warrants, and, on that basis, denies such allegation. The remaining allegations in this paragraph are admitted.

41.     Admit that VNUE did not sign or return the GOLOCK or DBW Warrants.  The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

**First Cause of Action**

42.     In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

43.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

44.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

45.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

46.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

47.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

48.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

49.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

50.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

51.     Denied.

## Second Cause of Action

52.     In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

53.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

54.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

55.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

56.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

57.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

58.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

59.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

60.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

61.    Denied.

## Third Cause of Action

62.    In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

63.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

64.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

65.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

66.    The allegations of this paragraph are conclusions of law and/or of the pleader to

which no responses are required; if responses are required, the same are hereby denied.

67.     Admit that the share price for VNUE common stock was $.0004 on December 23, 2019. The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

68.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

69.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

70.     The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

71.     Admitted that the high trading price for VNUE common stock on June 21, 2021, was $0.0150. The remaining allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

72.     Denied that Defendant has engaged in wrongful conduct.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

73.     Denied.

74.     Denied.

75.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

76.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

77.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

78.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

79.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

80.     Denied.

**<u>Fourth Cause of Action</u>**

81.     In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

82.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

83.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

84.     Defendant lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

85.     Denied.

86.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

87.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

88.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

89.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

90.     Denied that Defendant has engaged in wrongful conduct. The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

91.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

92.     Denied.

**Fifth Cause of Action**

93.     In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

94.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

95.     Denied.

96.     Denied that Defendant has engaged in wrongful conduct.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

97.     Denied.

## Sixth Cause of Action

98.     In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

99.     The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

100.     Denied.

101.     Denied that Defendant has engaged in wrongful conduct. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

102.     Denied

## Seventh Cause of Action

103.     In answer to the allegations of this paragraph, Defendant incorporates its answers

to the foregoing paragraphs of the Complaint.

104.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

105.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

106.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

107.    The allegations in this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

108.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

109.    Admitted.

110.    Admitted that VNUE terminated its transfer agent.  The remaining allegations in this paragraph are denied.

111.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and, on that basis, denies each and every allegation contained therein.

112.    Admitted.

113.    Denied.

114.    Admitted that VNUE permitted YLimit, LLC to convert $963,000 of debt into stock.  Denied that Plaintiffs are investors.  The remaining allegations in this paragraph are denied.

115.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

116.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

117.    The allegations of this paragraph characterize the contents of a document; the document speaks for itself and Defendant denies the allegations to the extent that they are inconsistent with the document.

118.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

119.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

120.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

121.    Denied.

## **Eighth Cause of Action**

122.    In answer to the allegations of this paragraph, Defendant incorporates its answers to the foregoing paragraphs of the Complaint.

123.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

124.    Admitted.

125.    Admitted that Defendant obtained deferrals of its payments under the Notes.  The remaining allegations are denied.

126.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

127.    The allegations of this paragraph are conclusions of law and/or of the pleader to which no responses are required; if responses are required, the same are hereby denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

The allegations in the paragraph beginning with "WHEREFORE" on page 23 of the Complaint require no response; if responses are required the allegations are hereby denied.

Further answering the Complaint, Defendant denies any and all allegations not specifically denied herein, that it has engaged in wrongdoing, or tortious or unlawful activity, or that Plaintiffs are entitled to relief.

Further answering the Complaint, Defendant denies each and every allegation of the Complaint to the extent not answered or not fully answered.

## Defenses

A.    The complaint fails to state a claim upon which relief can be granted.

B.    Defendant did not breach an agreement entered into between itself and Plaintiffs.

C.    The transactions between the parties contain indefinite and unenforceable terms.

D.    Plaintiffs have remedies at law that prohibit their entitlement to certain types of equitable relief, including but not limited to injunctive relief.

## **Affirmative Defenses**

A.      Plaintiffs' claims are barred because the transactions are void under Section 29(b) (15 U.S.C. § 78cc(b)) of the Securities Exchange Act of 1934 ("Act"), because Plaintiffs are unregistered securities dealers who could not lawfully purchase the convertible promissory notes in this case without violating Section 15(a)(1) of the Act (15 U.S.C. § 78o(a)(1)).

B.      Plaintiffs' claims are barred because the transactions are loans that, on their face, charge a patently usurious interest rate, with transaction documents demonstrating an intent to charge an interest rate in excess of 25% a.p.r., and Plaintiffs did charge a criminally usurious rate of interest, in violation of New York Penal Law § 190.40; hence the the transactions are void *ab initio* pursuant to GOL § 5-511.

C.      Plaintiffs' claims are barred to the extent that they failed to take reasonable care to avoid, minimize, or mitigate its damages, if any.

D.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

E.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of *in pari delicto.*

F.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unconscionability.

G.      Plaintiffs' claims are barred, in whole or in part, by the statute of frauds.

H.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of duress.

I.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## **Prayer for Relief**

**WHEREFORE**, Defendant respectfully requests that this Court:

A.      Dismiss the Complaint;

B.     Enter judgment in favor of Defendant and against Plaintiffs on all counts of the Complaint;

C.     Award Defendant its costs and expenses associated with this action, including attorney's fees and costs; and

D.     Award Defendant such other and further relief as the Court deems just and proper.

## **COUNTERCLAIMS**

Counterclaim Plaintiff VNUE, Inc., by its attorneys, for its Counterclaims against Counterclaim Defendants Golock Capital, LLC, DBW Investments, LLC, Crossover Capital Fund II, LLC and against Counterclaim Defendants David Whitlock, Kenneth Lustig, and Christopher Gorog, states as follows.[1]

## **NATURE OF THE CLAIMS[2]**

1.     Golock is a "death spiral" or "toxic" lender:[3] an unregistered securities dealer that makes unlawful, predatory loans to small, publicly traded companies.[4]  A toxic lender purports to be an investor that can 'save' a struggling microcap, but the reality is very different.

---

[1] Plaintiff defines the following terms:  Counterclaim Plaintiff VNUE, Inc. ("Plaintiff" or "VNUE"); Counterclaim Defendant Golock Capital, LLC ("Golock"); Counterclaim Defendant DBW Investments, LLC ("DBW"); Counterclaim Defendant Crossover Capital Fund II, LLC ("Crossover II," and, collectively with Golock and DBW, the "Golock Lending Enterprise," "Golock Enterprise," or "GLE"), an association-in-fact; Counterclaim Defendant David Whitlock ("Whitlock"); Counterclaim Defendant Kenneth Lustig ("Lustig"); Counterclaim Defendant Christopher Gorog ("Gorog," and, collectively with Whitlock and Lustig, the "Golock Managers," and, collectively with GLE, the "Counterclaim Defendants").  Crossover Capital Fund I, LLC ("Crossover I") and Crossover Capital Management, LLC are affiliated entities and part of the GLE association-in-fact, but are not named as parties herein.
[2] This discussion is not intended to be exhaustive of the facts that support the relief sought herein.
[3] *See* SEC discussion of toxic lending and convertible securities at https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed May 3, 2022).
[4] As explained in greater detail, *infra,* part III, Golock Managers Whitlock and Gorog manage Golock Capital, Golock Managers Whitlock and Lustig manage Crossover I and Crossover II, and Golock Manager Whitlock manages DBW. None of the Golock Managers are now, or ever have been, registered as securities dealers with the SEC.  Although VNUE has located no public information (SEC filings) reflecting that the Golock or DBW entities effected securities transactions beyond those in this case, the situation is very different with the other entities in the Golock Lending Enterprise; for Crossover I and Crossover II, the purchase and sale of securities appears to be a major source of revenue:  From 2016 to date Crossover I has purchased debt securities similar to the notes in this case on *at least 38* separate occasions with *at least 12* other microcap companies, allowing Crossover I to acquire *at least 754,053,316* newly-issued shares of microcap stock with an estimated market value in the tens of millions of dollars, which Crossover I immediately sold into the public market. Similarly, during the same time period, Crossover II has

2.      Toxic lenders like the Golock Lending Enterprise are not investors.  They are *creditors* that contractually grant to themselves the right to take payment of the debt in company stock – via conversion – instead of cash.  The conversions come with a so-called *market adjustable discount* that guarantees the lender a discount of 40–50% on the stock price at the time of conversion.  The lender is then able to dump the stock into the public market immediately after conversion to reap the difference between the discount and the market price – completely unlike an actual private-placement investor.[5]  Further, toxic lenders give themselves the right to convert in tranches to insulate themselves from the price depression generally caused by their dumping of large quantities of the newly-issued stock – an arrangement that typically generates enormous profits.  All of this is possible by the *sine qua non* of toxic lending:  dodging SEC registration to evade regulatory oversight.

3.      The toxic lending business is illegal.  According to the Securities and Exchange Commission ("SEC"), toxic lenders using Golock's precise business model operate unlawfully as unregistered securities dealers, in violation of § 15(a) of the Securities Exchange Act of 1934 (the "Act") (15 U.S.C. § 78o).  The SEC has commenced civil actions against several toxic lenders based on these violations, and every court to address the dealer registration issue in this context has agreed with the SEC.[6]

---

purchased debt securities similar to the notes in this case on *at least 30* separate occasions with *at least 11* other microcap companies, resulting in Crossover II's acquisition of *at least 559,445,435* newly-issued microcap shares, with an estimated market value in the tens of millions of dollars, which Crossover II immediately sold into the public market.

[5] Toxic lenders take advantage of the so-called tacking provisions of Rule 144.  *See* 17 CFR § 230.144(d)(3)(ii).

[6] *See*, *e.g.*, *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife*, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) (the "SEC cases").  For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, 6 F.4th 50 (1st Cir. 2021), and *Auctus Fund, LLC v. Players Network, Inc.*, 20-cv-10766 (D. Mass. Dec. 10, 2021).

4.     The Agreements[7] in this case are the product of a well-established toxic lending

business that has made at least 38 unlawful loans over the span of about six years.

---

[7] The "Agreements" are defined as all of the transaction documents discussed herein. The convertible promissory notes and common stock purchase warrants discussed herein by each of the Counterclaim Defendants shall collectively be referred to as the "Notes" or "GLE Notes" and the "Warrants" or "GLE Warrants" respectively. Notwithstanding any contrary allegations herein, VNUE expressly reserves the right to assert contractual formation defenses with respect to the Warrants. The details of the Agreements are as follows:

**Golock Notes 1-5 and Amendments.   Note 1:** On **September 1, 2017**, Golock purchased from VNUE a Convertible Promissory Note (Golock Note 1") with a principal amount of $105,000.00 due in 9 months (June 1, 2018) and charging interest at 10% apr, (and $5,000 OID, and requiring delivery of 1,000,000 stock purchase warrants with a strike price of $.01 per share. **Conversion: FIXED PRICE**. Upon execution of Golock Amendment 2, Golock Note 1 became a 23 month Note with 10% stated interest and a 50% fixed conversion discount. The estimated minimum annual interest rate on Note 1, based on 10% APR + full conversion of debt + 10% accrued interest,  is **72.29% APR**.

**Note 2:** On **October 19, 2017,** Golock acquired an amended Convertible Promissory Note ("Golock Note 2") issued by VNUE, in the principal amount of $50,000, due in 9 months (June 26, 2018) and charging interest at 10% apr. **Conversion: FIXED PRICE**. Upon execution of Golock Amendment 2, Golock Note 2 became a 21.5 month Note with stated 10% interest and a 50% fixed conversion discount; the estimated minimum annual interest rate on Note 2 is **76.15% APR**.

**Note 3:** On **November 13, 2017**, Golock purchased from VNUE a Convertible Promissory Note ("Golock Note 3") with a principal amount of $36,750.00, due in 9 months (August 13, 2017) and charging interest at 10% apr.(and OID and 350,000 warrants for 0.01.). **Conversion: FIXED PRICE**. Upon execution of Golock Amendment 2, Golock Note 3 became a 20.5 month Note with stated 10% interest and a 50% fixed conversion discount; the estimated minimum annual interest rate on Note 3 is **78.40% APR.**

**Note 4:** On **February 2, 2018,** Golock purchased from VNUE a Convertible Promissory Note ("Golock Note 4") with a principal amount of $40,000.00 due in 9 months (November 2, 2018) and charging interest at 10% apr. **Conversion:  FIXED PRICE.** Upon execution of Golock Amendment 2, Golock Note 4 became an 18-month Note with stated 10%  interest and a 50% fixed conversion discount; the estimated minimum annual interest rate on Note 4 is **87.10% APR.**

**Note 5:** On **November 15, 2019**, Golock purchased from VNUE a Convertible Promissory Note ("Golock Note 5") in the amount of $53,331.00 and charging interest at 12% apr, due in 9 months (August 14, 2020).  **Conversion: FIXED 40% DISCOUNT.** The estimated minimum annual interest rate is **109.13% APR.**

**Amendments to Golock Notes 1-4.     Golock Amendment 1:** On November 5, 2018, Golock and VNUE executed an Amendment to Notes 1-4 that changed the maturity dates to November 30, 2018. As consideration for this extension, (ranging between 6 months (Note 1)  to 28 days (Note 4)),  Golock changed the conversion method from a fixed exercise price of $0.015 per share to a fixed 42% discount to the (20-day low) market price at the time of conversion.

**Golock Amendment 2:** On April 29, 2019, Golock and VNUE executed a second Amendment to Notes 1-4. The second Amendment changed the maturity dates from November 30, 2018 to July 31, 2019. As consideration for the 8-month extension, the conversion discount was increased to 50% and VNUE was required to convey to Golock a stock purchase Warrant for 12,833,333 shares of stock with a strike price of $0.00475.

**DBW Notes 1-2 and Amendments.     Note 1:** On December 20, 2017, DBW purchased from VNUE a Convertible Promissory Note ("DBW Note 1") with a principal amount of  $21,000.00, due in 9 months and charging 10% apr. **Conversion: FIXED PRICE.** Upon execution of DBW Amendment 2, DBW Note 1 became a 19.5 month Note with a stated 10% interest rate and 50% fixed conversion discount, with an estimated minimum annual interest rate of **78.16% APR.**

**Note 2:** On **January 18, 2018**, DBW purchased from VNUE a Convertible Promissory Note ("DBW Note 2") with a principal amount of $35,000.00, due in 9 months and charging 10% apr.; **Conversion: FIXED PRICE.** Upon execution of DBW Amendment 2, DBW Note 2 became an 18.5 month Note with a stated 10% interest rate and a 50% fixed conversion discount, with an estimated minimum annual interest rate of **86.3% APR.**

**Amendments to DBW Notes 1 and 2. DBW Amendment 1**: On November 7, 2018, DBW and VNUE executed an Amendment to both of the DBW Notes to extend the maturity dates from September 20, 2018 (DBW

5.      GLE executed conversions pursuant to three of the Notes in this case (Golock Note 5, Crossover II Notes 1-2), through which they have already extracted roughly a half-million dollars in company stock from VNUE, which they immediately sold into the public market.  This was accomplished through the fixed-discount conversion option in the Notes that gives GLE the right to convert the debt into VNUE stock at a *guaranteed 40-50% discount* to the market price at the time of conversion.

6.      Accordingly, among other relief sought by VNUE is rescission of the Agreements, pursuant to § 29(b) of the Act, on the grounds that each of the Agreements were both ***made*** and ***performed*** in violation of § 15(a) of the Act.  *See* 15 U.S.C. § 78o.

7.      Each of the Notes charge VNUE a rate of interest that is criminally usurious under New York law, which expressly governs all of the GLE Notes.  As shown in greater detail below, the GLE Notes charge an annualized interest rate between **72 and 109% APR**, while the maximum rate of interest that may be charged in New York is 25 percent APR.  *See* N.Y. G.O.L. § 5-501; N.Y. Penal Law. § 190.40.

8.      Consistent with GLE's established business model, the GLE Notes provide GLE with a conversion option, that is, the right to take repayment by exchanging the accrued debt (or

---

Note 1) and October 18, 2018, (DBW Note 2) **to November 30, 2018.** As consideration for the two month/ one month extension, DBW changed the conversion option from fixed exercise price of $0,015 per share, to a fixed 42% discount on the (20-day low) market price at conversion.  **FIXED 42% DISCOUNT.**

   **DBW Amendment 2**: On **April 29, 2019**, DBW and VNUE executed a second modification, which extended the due date of the Notes from November 30, 2018 to **July 31, 2019**.  As consideration for the 8-month extension, DBW reduced the conversion price to 50% of the 20-day low prior to conversion and required VNUE to convey a stock purchase Warrant for the purchase of approximately 3 million shares at a strike price of $.00475 per share. **FIXED 50% DISCOUNT.**

   **Crossover II Notes.   Note 1:  On August 21, 2017,** Crossover II purchased from VNE a Convertible Promissory Note ("Crossover Note 1") with a principal amount of $61,000.00 due 1 year later and charging 8% apr.  Crossover Note 1 gave Crossover II the right to convert the debt at a fixed 50% discount.  Estimated minimum annual interest rate: **108%. FIXED 50% CONVERSION DISCOUNT.**

   **Note 2:**  On **March 2, 2018**, Crossover II purchased from VNUE a Convertible Promissory Note ("Crossover Note 2") in the amount of $38,500.00 due 9 months and bearing a 10% annual interest rate, and giving Crossover II a fixed 50% discount at conversion. Estimated minimum annual interest rate: **143% FIXED 50% CONVERSION DISCOUNT.**

any portion thereof) for shares of company stock.  Consistent with their general practice, GLE does not exchange the debt on a dollar-for-dollar basis, but at a 40 -50% discount to the market price at the time of conversion.

9.      The Golock Lending Group is an association-in-fact "enterprise" as defined in  the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

10.      The Golock Lending Group has engaged in the collection of an unlawful debt at the direction and control of the Golock Managers:  GLE has already collected unlawful debts from VNUE.  In its suit against VNUE, GLE now seeks to collect – *with the assistance of this Court – more* unlawful debts under the remaining usurious GLE Notes.

11.      Accordingly, among other relief sought by VNUE, is treble damages under RICO, attorneys fees, and any and all other relief that the Court deems just, proper, and in the interests of justice because the amount of interest charged by GLE in each of the Notes charge *more than double the maximum enforceable rate of interest allowed by New York law.*

## PARTIES

12.      VNUE is a Nevada corporation with its principal place of business at 104 W. 29th Street, 11th Floor, New York, New York 10001.

13.      VNUE stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major exchanges—are traded.

14.      Golock is a Washington corporation that maintains its principal place of business at 365 Ericksen Ave NE # 315, Bainbridge Island, WA 98110-1888.

15.      Golock is not now, and has never been, registered as a securities dealer with the SEC.

16.     DBW is a Washington corporation that maintains its principal place of business at 365 Ericksen Ave NE # 315, Bainbridge Island, WA 98110-1888.

17.     DBW is not now, and has never been, registered as a securities dealer with the SEC.

18.     Crossover II is a Washington corporation that maintains its principal place of business at 365 Ericksen Ave NE # 315, Bainbridge Island, WA 98110-1888.

19.     Crossover II is not now, and has never been, registered as a securities dealer with the SEC.

20.     Upon information and belief, Whitlock is a Managing Member of Golock, DBW, Crossover I, and Crossover II.

21.     Whitlock is listed as a director for Golock, DBW, Crossover I, Crossover II, and Crossover III.

22.     Whitlock is not now, and has never been, registered as a securities dealer with the SEC.

23.     Lustig is a Managing Member of Crossover I, Crossover II, and Crossover Capital Management.

24.     Lustig is not now, and has never been, registered as a securities dealer with the SEC.

25.     Gorog is a Managing Member of Golock.

26.     Gorog is not now, and has never been, registered as a securities dealer with the SEC.

# FACTUAL ALLEGATIONS

## I.      THE GOLOCK LENDING ENTERPRISE

27.      The Golock Lending Enterprise is an ongoing association-in-fact, with apparent relationships among the Counterclaim Defendants as depicted in **Figure A**, below.

### FIGURE A



28.      The Golock Lending Enterprise exists to lend money for profit using the business model described herein.

29.      Upon information and belief, the Golock Lending Enterprise makes loans to other issuers that violate RICO in the same manner as the Agreements in this case.

## II.      THE GOLOCK LENDING ENTERPRISE'S GENERAL BUSINESS MODEL

*GLE Purchases Convertible Notes From Financially-Strapped*
*Issuers for the Purpose of Acquiring Stock at a Substantial*
*Discount*

30.     Upon information and belief, the Counterclaim Defendants positioned themselves to take advantage of issuers' vulnerable financial condition, and thereby obtain highly favorable terms.

31.     Upon information and belief, the Counterclaim Defendants obtained all of the stock directly from the issuers through note conversions, as opposed to purchasing it in the open market in the (*i.e.*, like a "trader").

32.     Because the shares that the Counterclaim Defendants obtained were newly-issued, the Counterclaim Defendants' subsequent dumping of the shares into the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals.  Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

33.     In addition to reaping gains from the spread between the discount and the market price, the Counterclaim Defendants negotiated additional consideration such as up-front stock, stock purchase warrants, and compensation for fees and costs.

***GLE Converts Debt Into Stock at a Substantial Discount***

34.     The Counterclaim Defendants' business model exploits the tacking provision of SEC Rule 144[8] by holding only the promissory notes (which are payable absolutely and carry no investment risk) for six months. Upon conversion of the notes into stock, Counterclaim Defendants

---

[8] SEC Rule 144 was adopted to establish criteria for determining whether a person was engaged in the distribution of securities.  One condition under Rule 144 is that the selling security holder must have held the security for a specified period of time (six months in this case) prior to resale into the market.  This condition helps ensure that the holder who claims an exemption has assumed the full economic risks of ownership, and is therefore not acting as an underwriter.  Rule 144 also permits "tacking" of the six-month holding period; if a security holder simply exchanges a previously-purchased security for a different security of the same issuer (such as with conversion), the newly-acquired security is deemed to have the same purchase date as the original security.  If the holding period has expired, the new security may be sold immediately.

do not assume any economic risks of stock ownership—they immediately sell the stock to reap the spread between the discount and the market price.

35.     The value of the conversion discount at the time of entering into these transactions is a component of interest under New York state law that must be considered when calculating the true interest rate for usury purposes.[9]

36.     Upon information and belief, GLE times their conversions to occur after expiration of the holding period under Rule 144, so that the securities acquired thereby could be immediately sold into the public market.  For that reason, Counterclaim Defendants generally wait either six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the minimum Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note, before they begin to convert the note into newly-issued stock and then sell that stock into the public market.

37.     The convertible notes that Counterclaim Defendants purchased from the issuers allowed them to acquire *no fewer than one billion shares of newly-issued stock* at a substantial discount—typically between 30 and 50 percent below the lowest trading price for the issuer's common stock during the 20 trading days preceding the date of the conversion request.

38.     Typically, the GLE convertible note agreements impose additional and multiple default penalties on issuers if GLE encounters a difficulty depositing the stock with brokerages, or if any other "event of default" occurs under the note.

39.     Upon information and belief, instead of converting all of the debt into stock all at once, Counterclaim Defendants usually send multiple conversion notices for each convertible note. Upon information and belief, among other reasons, Counterclaim Defendants incrementally

---

[9] *See Adar Bays, LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320, 336-39 (2021).

convert debt into stock and sell said stock over a period of time to purposefully avoid owning more than five percent of any class of an issuer's publicly traded stock at any one time.  Far from an investment strategy, such incremental conversions and sales are timed for the purpose of evading the requirement to file a "beneficial ownership report" with the SEC (Schedule 13D).  *See* 17 C.F.R. § 240.13d-1.

40.     Upon information and belief, Defendants arrange for the converted stock to be transferred to their brokerage accounts as quickly as possible to ensure maximum profits and to capitalize on the conversion discount, often paying expediting fees to further reduce the time.

41.     Upon information and belief, As part of their business model, Counterclaim Defendants obtain rather elusive and oftentimes inaccurate attorney opinion letters to assure brokerage firms that the converted stock is not restricted and can be resold to the public.

### Counterclaim Defendants Sell the Converted Stock Into the Public Market

42.     Upon information and belief, once brokers deposit the converted shares from the issuers into the Counterclaim Defendants' brokerage accounts, the Counterclaim Defendants generally begin selling the shares into the public marketplace immediately to lock in their profits.

43.     Upon information and belief, the Golock Managers personally, or through an affiliated person, entity, or independent contractor acting at their direction, use the telephone and the internet to place sell orders.  Sales are made through brokers.

44.     Upon information and belief, however, Counterclaim Defendants generally only sell as much as the market could bear, often staggering their sales over a short period of time instead of all at once.

45.     Upon information and belief, Counterclaim Defendants' practice is to sell the shares they acquire in a conversion continuously on a daily or near-daily basis until they sell *all* of their shares into the market.

### Counterclaim Defendants Earn Significant Profits from Selling Discounted Shares of Stock

46.     Upon information and belief, Counterclaim Defendants reap large profits from their unregistered dealer activity, the majority of which results from reaping the difference between the market prices they received when they sell the stock to the public, and the deeply-discounted prices at which they acquire shares from the issuers, rather than from any appreciation in the stock's price.  This mechanism gives Counterclaim Defendants a spread or markup on the stock that they sell, which is a common attribute of a securities dealer.

47.     Between January 2016 and August 2019, Counterclaim Defendants *purchased no fewer than **45 convertible promissory notes*** (securities) and converted the same into *no fewer than **one billion shares** of newly-issued stock* that Counterclaim Defendants subsequently sold on the secondary market for tens of millions of dollars.  Counterclaim Defendants have engaged in securities transactions with *no fewer than **20 issuers***.

48.     Upon information and belief, Counterclaim Defendants generated tens of millions of dollars in gross stock sale proceeds, with many other securities transactions still outstanding. The majority of the net profits came from the spread between Counterclaim Defendants' discounted purchase price (per the terms of the applicable note) and prevailing market pricing.

### III.     THE GOLOCK LENDING GROUP'S BUSINESS MODEL AS APPLIED TO PLAINTIFF

### Counterclaim Defendants Purchased Convertible Notes (Securities) from VNUE

49.     The Counterclaim Defendants' business model—as reflected in the conduct alleged above—manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions and Federal court decisions.

50.     Chief among these characteristics is reaping profits from the purchasing of convertible notes and selling newly-issued securities that would be acquired directly from an issuer through conversion for Counterclaim Defendants' own accounts.

51.     The Agreements in this case were executed by VNUE and Counterclaim Defendants between August 2017 and November 2019.  Under all nine Notes, GLE loaned VNUE approximately $400,000 (based on the face value of the Agreements).[10]

### Counterclaim Defendants Converted the Agreements (Securities) to Stock (Securities) Pursuant to the Agreements with VNUE

52.     Shortly after the expiration of the Rule 144 holding period for the securities, Crossover II submitted 12 separate conversions[11] under the Crossover II Notes, pursuant to which Crossover II acquired approximately 70,000,000 newly-issued shares of VNUE stock.

53.     ***Each of these 12 conversions is a separate securities transaction.***

54.     Pursuant to these 12 conversions, Crossover II converted a total of approximately $100,000 of debt.  Based on the average daily trading price on the day the corresponding conversion notice was submitted, the estimated open market value of the newly-issued VNUE stock received by Crossover II pursuant to the conversions is approximately $400,000.

---

[10] Each of the Notes subtracted additional and substantial charges from the amount loaned to VNUE, purporting to be an original issue discount ("OID"), and/or legal fees and due diligence fees.  Minus OID, the total amount conveyed to VNUE for Golock Notes 1-4 was **$220,000.00;** VNUE obtained **$50,000** for DBW Notes 1-2.  Under Golock Note 5 (repaid in full) VNUE received **$51,831**, and under Crossover Capital Notes 1 and 2 (repaid in full) VNUE received **$89,000.**

[11] Each conversion under a Note shall be referred to as a "Related Transaction."

55.     Shortly after the expiration of the Rule 144 holding period for the securities, Golock submitted five separate conversions under the Golock Note 3, pursuant to which Golock acquired approximately 100,000,000 newly-issued shares of VNUE stock.

56.     ***Each of these five conversions is a separate securities transaction.***

57.     Pursuant to these five conversions, Golock gained repayment of approximately $24,000 in debt (principal plus interest) by exchanging it for $65,000 worth of freely-trading VNUE stock.[12]

### Counterclaim Defendants Quickly Sold the VNUE Stock (Securities) Acquired through Conversion

58.     Investment is not part of the Counterclaim Defendants' business model.

59.     Counterclaim Defendants relied on their conversion discount to maximize profits, while driving down VNUE's trading price due to the liquidation of the Counterclaim Defendants' sizable positions.

60.     Upon information and belief, as soon as Counterclaim Defendants received the newly-issued VNUE shares, they immediately sold them into the marketplace to reap a substantial profit—***even while VNUE's trading price was falling.***

61.     Counterclaim Defendants' business model is similar to the one used by the defendants in *SEC v. Big Apple Consulting USA, Inc*., 783 F.3d 786 (11th Cir. 2016), *SEC v. Almagarby*, 479 F.Supp.3d 1266 (S.D. Fla. 2020), *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020), and *SEC v. Fife*, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).

### Counterclaim Defendants Violated the Federal Securities Laws by Acting as Unregistered Dealers

---

[12] Based on the VNUE's closing trading price on the conversion date.

62.     Counterclaim Defendants' purchase convertible notes (securities transactions), convert debt into stock (securities transactions), and subsequently sell stock (securities transactions) are part of an ongoing business.

63.     Counterclaim Defendants acquire large volumes of shares directly from issuers at a substantial discount to market, which they sell into the open market for substantial profit due to the conversion discount, and do so absent investment intent.  Counterclaim Defendants do all of this—buy, convert, and sell securities—as part of their regular business and for their own accounts.

64.     The SEC's EDGAR database shows that, since 2015, Counterclaim Defendants have purchased similar convertible securities on more than 60 occasions, from no fewer than 20 other microcap companies.

65.     Upon information and belief, Counterclaim Defendants made use of the mails, email, and other instrumentalities of interstate commerce to effect the securities transactions under and pursuant to the Agreements.  For example, Counterclaim Defendants use the internet to solicit penny stock issuers, use wire transfers to move cash, and use email and telephone communications to negotiate and effectuate stock sales through their brokers.

66.     Upon information and belief, Counterclaim Defendants paid several independent contractors to assist them in locating, negotiating, and managing their transactions.

67.     Counterclaim Defendants, by not registering as dealers as is required under the Act, violated the act and in doing so, did not have the legal capacity to enter in any of the securities transactions with Plaintiff.

68.     By failing to comply with the dealer registration requirements and federal securities laws, Counterclaim Defendants purposefully "operate under the radar" to avoid important regulatory obligations that govern dealer conduct in the marketplace, including submitting to

regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

69.     In light of the difficulty of assessing damages, the equitable remedy of rescission established by § 29(b) of the Act, voiding and rescinding the Agreements (to return the parties to their pre-contract positions) should be effectuated by ordering Counterclaim Defendants to return to VNUE every share of stock it acquired under the Agreements (or the cash equivalent thereof), less the net sums provided to VNUE under the Agreements.

70.     VNUE is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

71.     In the alternative, Counterclaim Defendants should pay rescissionary damages in an amount constituting the full market value of the stock wrongfully acquired and cash amounts received, both with statutory prejudgment interest.

72.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer. *See* § 78o(a)(1).

73.     At no time while the Counterclaim Defendants were, and continue to be, engaged in the conduct described above were any of them registered with the SEC as dealers or associated with dealers registered with the SEC.

74.     A person who acts as a dealer must file an application using Form BD. Form BD asks an applicant to answer questions about the applicant and its principals, controlling persons, and employees. The applicant must file the Form BD with the Central Registration Depository, which is operated by FINRA.

75.     The dealer registration requirements provide important safeguards for the investing public, shareholders and companies. The excessive compensation and patently unfair terms used in the Agreements (and GLE's transactions with other issuers) would have violated FINRA Rules 5110(b)(4)(B) and 5110(c)(2)(A), and hence could not have been effected by a registered securities dealer.

### The Agreements Are Usurious and Unenforceable Under New York Law

76.     On their face, the GLE Notes required that for every 100 dollars of debt converted, the Counterclaim Defendants obtained a minimum of $200 in stock.

77.     Golock Notes 1-4 and DBW Notes 1-2 initially charged only 10% interest and a conversion option with a fixed $0.015 per share conversion price.  All of these fixed-price conversion options were changed, however, to fixed (50%) discount conversion options by Amendment.

78.     Golock Note 5 and Crossover II Notes 1 and 2 contained conversion options with a fixed 40% discount at conversion.

79.     Each of the Agreements state that they are governed by New York law.

80.     New York law requires the value of the conversion discount to be included in the interest calculation.[13]

81.     With gains guaranteed by the conversion discount added to the stated rate of no less than 8% for any of the GLE Notes, the minimum interest charged is estimated to range from **72% to 109% APR.**

82.     The Agreements also charged disguised interest in the form of various fees, and required VNUE to deliver stock purchase warrants as additional consideration for the loans.

---

[13] *See Adar Bays, LLC v. GeneSYS ID, Inc.,* 37 N.Y.3d 320, 336-39  (2021).

83.     The Agreements between Counterclaim Defendants and VNUE in this case violated federal securities laws because Counterclaim Defendants, as unregistered securities dealers, were prohibited from entering into contracts transacting in securities (and which are themselves securities).

84.     For all the foregoing reasons, the Agreements were unlawful *as made.*

### *The Golock Managers Control The Golock Lending Enterprise In Its Convertible Debt Securities Business*

85.     At all relevant times, the Golock Managers did and presently do possess and exercise the ultimate decision-making authority and control over GLE, including the power to decide whether to enter into each of the securities transactions (including the Agreements with VNUE), to negotiate and approve the final deal terms, and to monitor the status of GLG's lending, and acquisition and sales of stock.

86.     The Golock Managers personally – or through others employed by the Golock Managers and acting under their direction and control – negotiated the terms of the convertible notes that GLG purchased from penny stock issuers (including the Agreements with VNUE), as well as Amendments to the original terms.  The Golock Managers also signed the contracts by which GLG acquired the convertible notes, including the Agreements with VNUE.

87.     Ultimately, the Golock Managers were and remain the sole persons with the power to direct, authorize, and compel GLG as an enterprise to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Agreements with VNUE.

88.     At all times relevant hereto, each of the Golock Managers intend to engage in the violations of RICO alleged herein, with actual knowledge of the illegal activities.

### *The Unlawful Debt*

89.     Because the GLE Notes charge more than double the maximum enforceable rate of interest allowed by New York law, GLE has engaged in the collection of unlawful debt under RICO as follows:

> a.  Golock Notes 1-4, as amended, charge an interest rate between **72 and 87%** APR interest rate;
>
> b.  Golock Note 5, pursuant to which *GLE has unlawfully collected repayment,* charged a minimum **109.13%** APR interest rate;
>
> c.  DBW Notes 1-2, as amended, charge an interest rate in excess of **78 to 86%** APR interest rate;
>
> d.  Crossover Capital Notes 1-2, pursuant to which GLE has unlawfully collected repayment, charged an interest rate in excess of **108%** APR.

90.     The GLE Notes evidence an unlawful debt under RICO because each of the GLE Notes charge more than twice the enforceable rate under New York law, and GLE is in the business of making usurious loans.  *See* 18 U.S.C. § 1961(6).

91.     The New York Criminal Usury Statute provides:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

N.Y. Penal Law. § 190.40.

92.     Under the GLE Notes, VNUE had an absolute obligation to repay the money loaned, either in cash or in stock.

93.     Pursuant to the express terms of the GLE Notes, GLE had the right to take VNUE stock as repayment for the loans, but at a substantial 40-50% discount to the market price at the time of conversion.

94.     A fixed conversion discount is deemed to be interest that must be included in the interest calculation for purposes of a usury analysis in New York. *See Adar Bays, supra,* 37 N.Y.3d at 338.

95.     The GLE Notes in this case were governed by the laws of the State of New York. Pursuant to New York's usury laws, the maximum enforceable legal rate for a loan to a corporation is 25% per annum.[14]  *See* Penal Law § 190.40 as applied through G.O.L. §5-501 et. seq.

96.     Although the GLE Notes impose a stated interest rate between 8-12% per annum, the added value conferred by the fixed 40-50% conversion discount produces an estimated interest rate of between 72-109% APR, which is three to four times the maximum enforceable rate permitted by New York's criminal usury law.

97.     As demonstrated by the many additional convertible note transactions with other issuers alleged above, which are governed by New York law and exact a rate of interest that is clearly usurious, GLE is engaged in the business of lending money at a usurious rate.

### *The Golock Managers Conspired To Collect an Unlawful Debt*

98.     The Golock Managers agreed and conspired to violate 18 U.S.C. 1962(c).

99.     Upon information and belief, the Golock Managers, by and through their agents and/or on behalf of themselves as individuals, agreed and conspired to conduct and participate in the affairs of the enterprise by engaging in the collection of an unlawful debt.

---

[14] In addition to the GLE Notes, many, if not all, of the other convertible promissory notes entered into by GLE with other securities issuers imposed substantially similar terms including a New York choice of law provision and a steep conversion discount to market.

100.    Upon information and belief, each of the Golock Managers knew about and agreed to facilitate the violation of § 1962(c) herein alleged.

### *VNUE was Harmed by the Unlawful Debt Collection*

101.    As a result of the Golock Lending Enterprise's unlawful loans, they obtained tens of millions of shares of free-trading VNUE common stock to which they were not entitled or capable of lawfully receiving.

102.    The Related Transactions forced VNUE to increase its number of shares issued and outstanding, thereby massively diluting VNUE's stockholders and harming its market capitalization.

103.    Once the Counterclaim Defendants began converting under the Agreements, their immediate and massive selling of large blocks of newly-issued shares of VNUE common stock into the public market caused enormous depression in VNUE's market capitalization and stock price.

104.    As a result of the Counterclaim Defendants' actions, VNUE became unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short-term financing, leading to more losses.

105.    Assessment of the total damage caused by the Counterclaim Defendants to VNUE is difficult to quantify and will be determined at trial.

### CAUSES OF ACTION

### COUNT I

*Violation of Section 15(a) the Act by* GLE
*for Making the Agreements While Operating as*
*Unregistered Securities Dealers*
(Against All Counterclaim Defendants)

106.     VNUE repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

107.     Section 29(b) of the Act provides in relevant part that:

*Every contract <u>made in violation</u> of any provision of this chapter or of any rule or regulation thereunder ... shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or   … engaged in the performance of any such contract**…**

15 U.S.C. § 78cc(b) (emphasis added).

108.     The Agreements were made in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

109.     The parties part of the GLE are securities dealers within the meaning of the Act. *See* 15 U.S.C. § 78c(a)(5).

110.     The parties part of the GLE are not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

111.     The parties part of the GLE affected transactions in securities in the VNUE Transactions and in the Related Transactions.

112.     The parties part of the GLE used the means of interstate commerce to effectuate the VNUE Transactions and in the Related Transactions.

113.     As a party to the VNUE Transactions and the Related Transactions, VNUE is in contractual privity with the parties part of the GLE.

114.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

115.    Because the parties part of the GLE affected the VNUE Transactions and the Related Transactions in securities as unregistered dealers, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when made.

## COUNT II

*Violation of Section 15(a) the Act by* GLE *for Performing the Agreements as Unregistered Securities Dealers*
(Against All Counterclaim Defendants)

116.    VNUE repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

117.    Section 29(b) of the Act provides in relevant part that:

*Every contract ...* (including any contract for listing a security on an exchange) heretofore or hereafter made, *the performance of which involves the violation of*, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, *shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … engaged in the performance of any such contract… *Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made… any such contract…*

15 U.S.C. § 78cc(b) (emphasis added).

118.    The Agreements were performed in violation of § 15(a) of the Act, 15 U.S.C. § 78o(a)(1), which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

119.    The parties of the GLE are securities dealers within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

120.    The parties of the GLE are not registered as dealers with the SEC or with any other regulatory body, as required by §  15(a) of the Act,15 U.S.C. § 78o(a)(1).

121.    The parties of the GLE effected transactions in securities in the Agreements and in the Related Transactions.

122.    The parties of the GLE used the means of interstate commerce to effectuate the Agreements and the Related Transactions.

123.    As a party to the Agreements and the Related Transactions, VNUE is in contractual privity with the parties of the GLE.

124.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, VNUE, as an issuer, is within the class of persons that the Act was designed to protect.

125.    Because the parties of the GLE affected the Agreements and the Related Transactions in securities as unregistered dealers, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful when performed via the conversions.

### COUNT III

*Violation of Section 20(a) of the Act by the Golock Managers*
*As Control Persons of the Golock Lending Enterprise, Based on*
*the Transactions in Securities as Unregistered Dealers*
(Against the Golock Managers)

126.    VNUE repeats, reiterates, and re-alleges each and every allegation of the prior paragraphs as though set forth herein.

127.    The Golock Managers had the power and authority to cause Golock and DBW to engage in the wrongful conduct described in Counts I and II herein.

128.    The Golock Managers did in fact cause Golock and DBW to engage in the wrongful conduct described herein in paragraphs 1 through 124 (including Counts I and II).

129.    The Golock Managers did not act in good faith.

130.    The Golock Managers directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

131.    Therefore, the Golock Managers acted as control persons of the Corporate Defendants within the meaning of § 20(a) of the Act.  15 U.S.C. § 78t.

## COUNT IV

*Unjust Enrichment*
(Against All Counterclaim Defendants)

132.    VNUE repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

133.    The Counterclaim Defendants have received valuable benefits from VNUE, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of VNUE common stock.

134.    These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

135.    The Counterclaim Defendants have unjustly retained these benefits at VNUE and its stockholders' expense.

136.    As a result, the Counterclaim Defendants have been unjustly enriched.

## COUNT V

*Constructive Trust*
(Against All Counterclaim Defendants)

137.    VNUE repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

138.    As alleged in Count Four, the Counterclaim Defendants have been unjustly enriched by VNUE.

139.    The circumstances are such that it would be inequitable for the Counterclaim Defendants to retain the property conferred on them by VNUE.

140.    VNUE has a specific, identifiable interest in the property unjustly retained by the Counterclaim Defendants as a result of the VNUE Transactions.

141.    Counterclaim Defendants have wrongfully acquired and detained VNUE's property obtained via the Agreements.

142.    Allowing the Counterclaim Defendants to retain the property conferred on them by VNUE would inequitably allow Counterclaim Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes, including, without limitation, paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

143.    As a result, a constructive trust should be imposed on VNUE's property, or equivalent value thereof, that has been wrongfully retained by the Counterclaim Defendants.

## COUNT VI

*Conducting the Affairs of the RICO Enterprise (RICO, § 1962(c))*
(Against All Counterclaim Defendants)

144.    VNUE repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

145.    Each of the three Golock Managers is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual capable of holding a legal or beneficial interest in property.

146.    The Golock Lending Group is a RICO association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1962(c).

147.    The Golock Managers agreed to and did conduct and participate in the conduct of the Enterprise's affairs through the collection of unlawful debt from VNUE, specifically, by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by loans by the enterprise that charge, take or receive interest at more than double the legal rate.

148.    Upon information and belief, pursuant to and in furtherance of their scheme, the Counterclaim Defendants enterprise is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country.

149.    The Golock Managers have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the collection of unlawful debt described above, in violation of 18 U.S.C. 1962(c).

150.    The activities of the Golock Managers' enterprise, which, inter alia, loaned money to corporations nationwide, affected interstate commerce.

151.    As a direct and proximate result of the Counterclaim Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), VNUE has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Counterclaim Defendants, and it has suffered further damage and injury to be determined at trial.

### COUNT VII

*Conspiracy to Violate § 1962 (c) (RICO, § 1962(d))*
(Against All Counterclaim Defendants)

152.    VNUE repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

43

153.    Each of the three Golock Managers is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual capable of holding a legal or beneficial interest in property.

154.    The Golock Lending Group is a RICO association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1962(c).

155.    Upon information and belief, the Counterclaim Defendants, by and through their agents and/or on behalf themselves as individuals, Gorog, Whitlock, and Lustig agreed between themselves to invest income that was derived from the unlawful debt created by convertible notes with certain public companies into other public companies in order to collect additional unlawful debt by providing unlawful convertible notes to those companies.

156.    Upon information and belief, the Counterclaim Defendants agreed and conspired to, by and through their agents and/or on behalf themselves as individuals, use the income derived from the collection of unlawful debt to acquire or maintain interests in the Corporate Defendants which make up the criminal enterprise and are, therefore, interests in the criminal enterprise.

157.    Upon information and belief, the Counterclaim Defendants agreed and conspired to, by and through their agents and/or on behalf themselves as individuals, to conduct and participate in the affairs of the enterprise by engaging in the business of collecting unlawful debt from desperate public companies alike.

158.    The Counterclaim Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from the collection of unlawful debt in an interstate enterprise, acquire or maintain interests in the enterprise through the collection of unlawful debt, and conduct and participate in the conduct of the affairs of the enterprise through the collection of unlawful debt.

159.   The Counterclaim Defendants intended to engage in the collection of unlawful debt and undertook the foregoing acts to further the schemes described above, which constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

160.   As a direct and proximate result of the Counterclaim Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), VNUE has been injured in its business and property because, among other things:  its market capitalization was significantly decreased, stock was unlawfully acquired by the Counterclaim Defendants, and further damage that is to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim Plaintiff VNUE seeks a Verdict and Judgment against the Counterclaim Defendants herein as follows:

A.   **Count I – Violation of Section 15(a) the Act by Counterclaim Defendants for Making the Agreements While Operating as Unregistered Securities Dealers (Against all Counterclaim Defendants)**

   a.   Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

      i.   The Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

      ii.   Counterclaim Defendants are operating as unregistered dealers in securities, in violation of the Act (15 U.S.C. § 78o);

      iii.   The Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

      iv.   Counterclaim Defendants are entitled to retain the principal amount

of the loans made pursuant to VNUE Transactions.

b.    VNUE requests that the Court enter an Order:

    i.    Rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

    ii.    Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

    iii.    Requiring Counterclaim Defendants to return to VNUE all VNUE stock obtained via the Agreements;

    iv.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

**B.    Count II – Violation of Section 15(a) the Act by Counterclaim Defendants for <u>Performing</u> the Agreements as Unregistered Securities Dealers (Against all Counterclaim Defendants)**

a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

    i.    Execution of the Agreements, which memorialize the purchase of a promissory note, conversion option, and stock purchase warrants, constitutes a transaction in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

    ii.    Counterclaim Defendants are operating as unregistered securities dealers as defined in the Act;,

    iii.    Counterclaim Defendants entry into the Agreements was unlawful in violation of the Act (15 U.S.C. § 78o);

        iv.     The Agreements are void under the Act (15 U.S.C. § 78cc); and

        v.     The Agreements are therefore unenforceable by any party and will not be enforced by the Court.

b.     VNUE requests that the Court enter an Order:

        i.     Rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

        ii.     Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

        iii.     Requiring Counterclaim Defendants to return to VNUE all VNUE stock obtained via the Agreements; and

        iv.     Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

**C.**     **Count III – Violation of Section 20(a) the Act by the Golock Managers As Control Persons of the Corporate Defendants, Based on the Transactions in Securities as Unregistered Securities Dealers (Against Golock Managers)**

a.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

        i.     Golock Managers had the power and authority to cause the Corporate Defendants to engage in the wrongful conduct described in Counts I, II and/or IV herein;

        ii.     Golock Managers did in fact cause the Corporate Defendants to engage in the wrongful conduct described in Counts I, II and/or IV herein; and

    iii.    Golock Managers acted as control persons of the Corporate Defendants within the meaning of Section 20(a) of the Act (15 U.S.C. § 78t(a)).

    b.    VNUE requests that the court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding the Golock Managers jointly and severally liable with and to the same extent as the Corporate Defendants are liable to VNUE under Counts I, II, and/or IV herein.

**D.**    **Count IV – Unjust Enrichment (Against all Counterclaim Defendants)**

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that:

    i.    Counterclaim Defendants have voluntarily accepted and retained the property conferred by VNUE through and as a result of violations of the Act (15 U.S.C. § 78o); and

    ii.    The circumstances are such that it would be inequitable for the Counterclaim Defendants to retain the property conferred on them by VNUE without first paying the value thereof to VNUE, to prevent the Counterclaim Defendants from being unjustly enriched.

    b.    VNUE requests that the Court enter an Order requiring the Defendants to return to VNUE the value of the property they have unjustly retained less the value conferred upon the Defendant.

**E.**    **Count V – Constructive Trust (Against all Counterclaim Defendants)**

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, VNUE requests the Court to declare that Counterclaim Defendants have

been unjustly enriched as alleged in Count IV; and

b.      VNUE requests that the Court enter an Order imposing a constructive trust on VNUE's property in the possession of Counterclaim Defendants as a result of the property conferred on them by VNUE.

**F.      Count VI – Conducting the Affairs of the RICO Enterprise (RICO, § 1962(c)) (Against All Counterclaim Defendants)**

a.      VNUE requests that the Court enter a Judgment against the Counterclaim Defendants as follows:

      i.      Awarding VNUE compensatory, direct, and consequential damages;

      ii.      Awarding VNUE treble damages as a remedy for the economic injury sustained by the Counterclaim Defendants' collection of unlawful debt;

      iii.      Awarding VNUE its attorneys' fees and costs associated with this litigation;

      iv.      Entering an award of monetary damages jointly and severally against the Counterclaim Defendants; and

      v.      Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

**G.      Count VII – Conspiracy to Violate § 1962 (c) (RICO, § 1962(d)) (Against All Counterclaim Defendants)**

a.      VNUE requests that the Court enter a Judgment against the Counterclaim Defendants as follows:

       i.      Awarding VNUE compensatory, direct, and consequential damages;

      ii.     Awarding VNUE treble damages as a remedy for the economic injury sustained by the Counterclaim Defendants' collection of unlawful debt;

     iii.    Awarding VNUE its attorneys' fees and costs associated with this litigation;

     iv.    Entering an award of monetary damages jointly and severally against the Counterclaim Defendants; and

      v.     Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

**H.**    **As to each of the foregoing Counts I-VII:**

    a.    To the extent permitted by applicable law, and not otherwise requested, VNUE requests that the Court enter an Order:

       i.      Awarding VNUE compensatory, direct, and consequential damages;

      ii.     Awarding VNUE punitive and/or treble damages, to deter the Counterclaim Defendants from continuing to engage in the same wrongful and unlawful transactions;

     iii.    Awarding VNUE its attorneys' fees and costs associated with this litigation;

     iv.    Entering any award of monetary damages jointly and severally against the Counterclaim Defendants; and

v.      Award such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

Dated: September 1, 2022          Respectfully submitted,

**THE BASILE LAW FIRM, P.C.**

By: *_/s/ Gustave P. Passanante_____*
GUSTAVE P. PASSANANTE, ESQ.
390 N. Broadway, Suite 140
Jericho, NY 11753
Tel.: (516) 455-1500
Fax. (631) 498-0478
Email: gus@thebasilelawfirm.com

***ATTORNEYS FOR DEFENDANT VNUE, INC.***