```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :       21cv8103 (DLC)
GOLOCK CAPITAL, LLC and DBW INVESTMENTS,  :
LLC,                                     :
                                         :       OPINION AND ORDER
                      Plaintiffs,        :
                                         :
              -v-                        :
                                         :
VNUE, INC.,                              :
                                         :
                      Defendant.         :
                                         :
---------------------------------------- X
```

APPEARANCES:

For the plaintiffs:
Daniel S. Steinberg P.C.
Daniel Seth Steinberg
355 Lexington Ave., Suite 401
New York, NY 10017

For the defendant:
The Basile Law Firm P.C.
Eric J. Benzenberg
Gustave Paul Passanante
390 North Broadway, Suite 140
Jericho, NY 11753

DENISE COTE, District Judge:

Golock Capital, LLC ("Golock") and DBW Investments, LLC ("DBW"; together, "Plaintiffs") issued seven loans in the form of convertible promissory notes to VNUE, Inc. ("VNUE"). Golock and DBW have sued VNUE for breach of its obligations under the notes. VNUE does not dispute that it has failed to repay the loans, but it asserts that the loans are criminally usurious and therefore void. Following a non-jury trial on the sole disputed

issue -- whether any of the interest rates associated with the notes was usurious -- the following constitutes the Court's findings of fact and conclusions of law.[1]  The interest rates were not usurious, and judgment is awarded to the Plaintiffs, including an award of attorneys' fees.

### Findings of Fact

From 2017 to 2019, VNUE obtained seven loans in the form of convertible promissory notes from Golock and DBW ("Notes").  In total, the Plaintiffs lent VNUE $341,081.  After describing the business of VNUE, the transactions between the parties are set forth.

VNUE describes itself as a music technology company that records concerts and sells that content online.  VNUE's platforms allow artists to livestream their concerts and sell tickets to those livestreams or provide concert attendees with the opportunity to purchase a recording of the concert immediately after it ends.

On May 5, 2017, Zach Bair, VNUE's Chief Executive Officer, reached out to David Whitlock stating that VNUE was "looking for short term funding and longer term funding strategies."  In his

---

[1] Most the of the findings of fact appear in the following section, but additional findings appear in the concluding sections of this Opinion.

email to Whitlock, Bair provided the following description of VNUE:

> We are a small cap public company with a team that has a track record of many successes over the years in technology and entertainment. We are building a platform that addresses licensing for artists (music), an app that allows us to record content and send that content instantly to it; and lastly, we are working to change the way that performance rights organizations charge small venues for licensing.

In VNUE's SEC Form 10-K filed in 2017, VNUE explained that it was a "relatively new company" that had received "no revenues from [its] operations." VNUE also stated that its "independent auditors have raised substantial doubts as to [its] ability to continue as a going concern without significant additional funding."

Whitlock understood that VNUE's ability to repay any loan was unpredictable. To account for this risk, he understood that loans to this kind of company commonly include a provision allowing the lender to convert the unpaid principal and interest on the loan into shares of the company's stock.

VNUE's common stock sold as penny stock[2] on the over-the-counter market. The stock traded with "substantial volatility" in its price. For example, on December 30, 2016, VNUE common stock traded at $0.0440; on February 7, 2020, it traded at

---

[2] A penny stock includes an equity security that has a price of less than $5.00. 17 C.F.R. § 240.3a51-1(d).

$0.0002.  The most recent trading data in the record is from November 22, 2022, on which date VNUE common stock traded at $0.0064.

In VNUE's SEC Form 10-K filed in 2023 ("2023 Form 10-K"), VNUE described the risks inherent in its common stock:

> The lack of an active market impairs your ability to sell your shares at the time you wish to sell them or at a price that you consider reasonable.  The lack of an active market may also reduce the fair market value of your shares.  An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares.
>
> Trading in stocks quoted on the OTC Pink Market is often thin and characterized by wide fluctuations in trading prices due to many factors that may have little to do with our operations or business prospects.  The securities market has, from time to time, experienced significant price and volume fluctuations that are not related to the operating performance of particular companies.  These market fluctuations may also materially and adversely affect the market price of shares of our common stock. Moreover, the OTC Markets is not a stock exchange, and trading of securities is often more sporadic than the trading of securities listed on a quotation system like Nasdaq or a national stock exchange like the NYSE.  Accordingly, <u>stockholders may have difficulty reselling any shares of common stock.</u>

(Emphasis supplied.)  VNUE is also subject to the SEC's penny stock rules, which VNUE notes in its 2023 Form 10-K may make it more difficult for a holder of its common stock to sell its shares.[3]

---

[3] <u>See</u> 17 C.F.R. § 240.15g-2.

After being contacted by Bair, Whitlock formed Crossover Capital Fund II, LLC ("Crossover") with Kenneth Lustig, and Crossover made two loans to VNUE through convertible promissory notes.  Lustig later declined to give VNUE more funds.

Whitlock, however, remained interested in funding VNUE, particularly because of its goal to use technology to change and bring transparency to the music licensing industry.  Whitlock formed Golock with Christopher Gorog, and formed DBW alone. Golock and DBW were created solely to provide funding to VNUE.

From September 2017 to February 2018, Golock and DBW made six loans to VNUE in the form of convertible promissory notes ("Original Notes").[4]  Four of the Original Notes were issued in 2017 ("2017 Notes"), and two were issued in 2018 ("2018 Notes"). The principal amount in the six Notes ranged from $21,000 to $105,000.  The terms of the Notes were eight to nine months. Each Note had a base interest rate per annum of 10%, and all but one of the Original Notes included an original issue discount[5] ("OID") ranging from $1,000 to $5,000.  These Notes also had a default interest rate set at the "highest (non-usurious) rate for when the Borrower may legally contract under applicable

---

[4] The terms of each Note are detailed in the Appendix to this Opinion.

[5] The OID is subtracted from the principal delivered to the borrower as a "discount" on the loan.

law," which applied to the past due principal and accrued interest on the Note as of the maturity date of the Note.  The parties agree that this rate is 24%.

The Original Notes also included a fixed-price conversion option that allowed the lender to convert any amount of the principal and interest on the loan into common stock of VNUE at a price set by the Note.  The Plaintiffs were permitted to convert the Notes either at the close of VNUE's anticipated private offering or six months after the execution date of the Notes.

The 2018 Notes, issued within fifteen days of each other, gave VNUE operating capital and allowed it to acquire Soundstr, a music identification technology and hardware system.  The OIDs for those Notes -- $5,000 per Note -- were intended by the Plaintiffs to reflect costs incurred by them and not as additional consideration for the loans.  Whitlock made three trips to Dallas, Los Angeles, and Nashville to conduct due diligence and learn about VNUE's plans to acquire Soundstr.  The expenses for those trips totaled $5,110.45.  The Plaintiffs also incurred legal expenses and wire transfer fees relating to the Notes.  Those expenses totaled approximately $2,835 per loan. When these expenses are deducted from the OID in the 2018 Notes, the interest rates of both of the 2018 Notes are under 25%.

VNUE was unable to pay its obligations under any of the Original Notes.  On November 2018, VNUE and the Plaintiffs agreed to amend the six outstanding loans ("First Amendments").  The Notes issued by Golock were amended on November 5, and the Notes issued by DBW were amended on November 7.  The principal of the Original Notes was increased to include the accrued interest as of the date of the amendments, and the maturity dates were extended to November 30, 2018.

To account for the continued risk of default on these loans, the Original Notes were amended to include a floating-price conversion option.  The floating-price conversion option allowed the Plaintiffs to convert the unpaid principal and interest "at any time" into shares at a set discount, i.e., percentage, of the lowest trading price of the shares in the twenty prior trading days.  The floating-price conversion option was more favorable to the Plaintiffs than a fixed-price conversion because it ensured that the lender would always get a discount on the shares no matter the trading price upon conversion.  The First Amendments changed the conversion price on the Original Notes to the lower of (i) $0.015 or (ii) 58% of the lowest trading price of the shares for the twenty prior trading days, including the date that the notice of conversion was received by VNUE or its trading agent ("Lowest Trading Price").

The maturity date for the First Amendments passed, and VNUE was still unable to pay its obligations under the Original Notes.  They were amended again on April 29, 2019 ("Second Amendments").  The principal of Original Notes was increased to include the accrued interest as of April 30, 2019, and the maturity date was extended to July 31, 2019.  The Second Amendments also changed the discount in the floating-price conversion option from 58% to 50% of the Lowest Trading Price.

Lastly, the Second Amendments required VNUE to issue Common Stock Purchase Warrants ("Warrants") to both Golock and DBW for a specified number of Shares at $0.00475 per share.  Pursuant to the Warrants, Golock was to receive 12,833,333 shares, and DBW was to receive 2,966,986 shares.

VNUE made two interest payments to the Plaintiffs of $5,874 and $2,517 in 2019.  From May to November 2019, Golock exercised its right to convert under one Note five times, for a total conversion amount of $24,387.50.  That conversion constituted roughly 7% of the outstanding principal of the Original Notes.

Golock provided one more loan to VNUE on November 15, 2019 ("2019 Note").  The maturity date of this Note was August 14, 2020.  This Note included a floating-price conversion option of 60% of the lowest trading price of the shares for the twenty-day period ending on the trading day prior to the conversion date. The 2019 Note permitted Golock to convert the principal and

8

unpaid interest during the time period between May 13, 2020 (180 days after the execution date of the Note) and the later of August 14, 2020 (the maturity date) or the date of payment of the amount owed under the Note upon an event of default.  The 2019 Note also included a base interest rate of 12% per annum, and any unpaid principal and accrued interest was subject to a default interest rate of 22% starting on the maturity date.

If Golock had exercised its right to convert the principal of the 2019 Note ($53,331) on the maturity date, it would have been entitled to buy 444,425,000 shares at a price per share of $0.00012.[6]  As of December 31, 2020, VNUE had 1,211,495,162 shares issued and outstanding.[7]  Therefore, had Golock converted the principal on the maturity date, it would have been equivalent to about 37% of the issued and outstanding shares, that is, more than one third of such shares.

Since the issuance of the first Note, the amount of issued and outstanding VNUE common stock steadily increased.  As of December 31, 2017, there were 74,335,070 shares of VNUE common

---

[6] The lowest trading price of the shares in the twenty dates before August 14, 2020 was $0.0002, and $0.0002 multiplied by 60% is $0.00012.

[7] Issued shares are shares that are authorized by a corporation's board of directors to be sold.  Outstanding shares are issued shares that are held by shareholders, that is, not reacquired by the corporation after issuance.  James D. Cox & Thomas Lee Hazen, Cox & Hazen on Corporations § 16.13 (2d ed. 2003).

stock issued and outstanding.  As of December 31, 2018, there were 105,635,816 shares of VNUE common stock issued and outstanding.  As of June 30, 2019, there were 383,570,162 shares of VNUE common stock issued and outstanding.

Whitlock never placed a specific dollar value on the conversion right in any of the Notes.  The Plaintiffs never made projections of what the value of the right to convert might be. The percentage discounts for the floating-price conversion options were determined through discussions and agreement with VNUE.  The conversion options were "adopted to mitigate loss" because the Plaintiffs were concerned that VNUE would never be able to pay back the loans.

When Golock sought to convert $5,025 of the debt into VNUE stock in December 2019, however, VNUE refused to permit that and all subsequent conversion attempts.  Additionally, although the Plaintiffs tried to obtain shares under the Warrants pursuant to the Second Amendments, VNUE also refused to allow the Warrants to be exercised and never issued these shares to the Plaintiffs.

As of May 22, 2023, VNUE owes the Plaintiffs $681,367.91 in unpaid principal and interest on the Original Notes.  Upon factoring in the Second Amendments and the value of the Warrants VNUE was to issue to the Plaintiffs, the Plaintiffs calculate the damages as $787,717.56 for unpaid principal and interest on the Notes; $516,541.65 for the value of the shares under the

Warrant issued to Golock; and $115,396.19 for the value of the shares under the Warrant issued to DBW.

Procedural History

The Plaintiffs filed this action on September 30, 2021. This Court has jurisdiction under 28 U.S.C. § 1332.  Following the New York Court of Appeals decision in Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320 (2021), the Plaintiffs amended the complaint on December 2.  The Plaintiffs bring claims of breach of contract for the unpaid principal, interest, and default interest on the Notes; breach of contract for failure to deliver the Warrants; and unjust enrichment.[8]  This case was reassigned to this Court on August 17, 2022.

On September 1, VNUE filed counterclaims against the Plaintiffs and others.  On December 13, VNUE moved for partial summary judgment on its affirmative defense of usury with respect to the 2018 Notes.  An Opinion of February 14, 2023 granted the Plaintiffs' motion to dismiss VNUE's counterclaims. Golock Capital, LLC v. VNUE, Inc., No. 21cv8103 (DLC), 2023 WL 1993432 (S.D.N.Y. Feb. 14, 2023).  An Opinion on March 8 denied VNUE's motion for partial summary judgment.  Golock Capital, LLC

---

[8] The Plaintiffs have withdrawn their claims for breach of contract for refusal to convert the Notes and for a mandatory injunction and specific performance.

v. VNUE, Inc., No. 21cv8103 (DLC), 2023 WL 2403011 (S.D.N.Y. Mar. 8, 2023).

Discovery closed on February 3.  Through an Order of March 1, a non-jury trial was scheduled for May 22, with the Pretrial Order documents due on May 5.  An Order of May 5 extended the deadline for the Pretrial Order documents to May 9.

On April 27, VNUE moved for summary judgment.  The parties submitted their joint pretrial order on May 9.  Also on May 9, VNUE filed a motion in limine to exclude the testimony of the Plaintiffs' rebuttal expert, Jeffrey Feinman.  A final pretrial conference was held on May 18.  VNUE's motion in limine and motion for summary judgment were denied on the record at that conference.

Pursuant to this Court's Individual Practices in Civil Cases regarding non-jury trials and without objection by the parties, the parties offered the direct testimony of their witnesses at trial by affidavit.  The evidence presented at this bench trial includes the Notes and the Amendments and testimony from Whitlock, the defendant's expert Dr. Scott D. Hakala, and Feinman.

A bench trial was held on May 23.  The three witnesses were subject to cross and redirect examination.  Counsel also presented their summation arguments.

### Conclusions of Law

As VNUE admitted in its proposed findings of fact and conclusions of law, VNUE "does not dispute that it violated the [Notes] by failing to honor conversions and repay the amounts due by the maturity date."  The sole dispute in this bench trial is whether VNUE has established the affirmative defense of criminal usury.

I.   Usury

A.   Legal Standard

"New York usury law is composed of General Obligations Law §§ 5-501, 5-511, 5-521; Banking Law § 14-a (1); and Penal Law § 190.40."[9]  Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 326 (2021).  Corporations are not allowed to interpose a defense of usury in any action, with a single exception.  N.Y. Gen. Oblig. Law § 5-521.  Corporations are allowed to interpose "a defense of criminal usury as described in section 190.40 of the penal law."  Id.  For loans of less than $2.5 million, the New York criminal usury statute provides that it is a felony when a lender

> without other legal authorization . . . knowingly
> charges, takes or receives any money or other property
> as interest on the loan or forbearance of any money or
> other property, at a rate exceeding 25% per annum or
> the equivalent rate for a longer or shorter period.

---

[9] The Notes are all governed by New York law.

Adar Bays, 37 N.Y.3d at 326 (citing N.Y. Penal Law § 190.40 and
N.Y. Gen. Oblig. Law § 5-501-6(b)) (emphasis added).  The "usury
statutes define 'interest' to include all collateral exchanges
of money or property."  Id. at 336.  When a loan is criminally
usurious, the loan contract is void ab initio, rending both the
principal and the interest uncollectable.  Id. at 331.

"[T]he modern conception of [New York] usury laws focuses
on the protection of persons in weak bargaining positions from
being taken advantage of by those in much stronger bargaining
positions."  Id. at 331-32.  The "harsh" consequence of
rendering usurious contracts void "reflects the legislature's
consistent condemnation of the evils of usury."  Id. at 332
(citation omitted).

"[T]he party seeking to void the loan agreement bears the
burden of proving usury."  Id. at 335-36.

> To successfully raise the defense of usury, a debtor
> must allege and prove by clear and convincing evidence
> that a loan or forbearance of money, requiring
> interest in violation of a usury statute, was charged
> by the holder or payee with the intent to take
> interest in excess of the legal rate.

Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc., 961
N.Y.S.2d 86, 89 (1st Dep't 2013).

"Usurious intent [is] an essential element of usury."
Freitas v. Geddes Sav. & Loan Ass'n, 63 N.Y.2d 254, 262 (1984).
"A loan is usurious if the lender intends to take and receive a

rate of interest in excess of that allowed by law even though
the lender has no specific intent to violate the usury law." In
re Venture Mortg. Fund, L.P., 282 F.3d 185, 188 (2d Cir. 2002)
(citation omitted). "[A] bona fide mistake of fact vitiates
usurious intent." Freitas, 63 N.Y.2d at 262.

"If usury can be gleaned from the face of an instrument,
intent will be implied and usury will be found as a matter of
law." Blue Wolf Capital, 961 N.Y.S.2d at 89. "[W]here usury
does not appear on the face of the note, usury is a question of
fact." Freitas, 63 N.Y.2d at 262. "[B]ecause a usurer usually
seeks to conceal the usury, and to accomplish the purpose by
indirect methods, questions of usurious intent and whether a
transaction is a cover for usury are typically questions of
fact." Adar Bays, 37 N.Y.3d at 339 (citation omitted); see also
Freitas, 63 N.Y.2d at 265. "To determine whether a transaction
is usurious, courts look not to its form but to its substance or
real character." Blue Wolf Capital, 961 N.Y.S.2d at 89.

Shortly after the commencement of this action, New York's
law on the calculation of interest for the purposes of assessing
usury was clarified. Before Adar Bays, New York state courts
and federal district courts in the Second Circuit had "generally
rejected the view that a conversion option with a discounted
rate should be treated as interest." Adar Bays, LLC v. GeneSYS
ID, Inc., 962 F.3d 86, 90 (2d Cir. 2020). The Second Circuit

Court of Appeals, however, certified that question to the New
York Court of Appeals, and on October 14, 2021, the New York
Court of Appeals held that "the value of the floating-price
convertible options should be included in the determination of
interest" in usury calculations.  Adar Bays, 37 N.Y.3d at 334.

The New York Court of Appeals declined to "endorse any
particular methodology" "to determine the value of stock
conversion options."  Id. at 339.  Adar Bays did conclude,
however, that the value should be "measured at the time of the
agreement."  Id. at 342.  A court may consider whether "the real
transaction was the loan or forbearance of money at usurious
interest."  Id. (citation omitted).  The possibility that a
conversion option "may result in a return exceeding 25% does not
render a loan usurious on its face."  Id. at 334.

The court emphasized certain principles that courts should
consider when valuing conversion options.  First, the valuation
"should exclude contingencies or risks that are part of any loan
transaction and, as such, are already taken into account by the
usury statutes," including the risk that a borrower may go
bankrupt.  Id. at 338.  Second, "if a lender has contractually
protected itself in the loan instrument against other risks,
those risks should also not be used to discount the value of the
conversion option."  Id.  Third, "the risk of a borrower

16

refusing conversion should not affect the value of the option."
Id. at 339.

The New York Court of Appeals anticipated that courts would
be assisted in valuing convertible options by expert testimony.
Id. at 340.  It also identified as relevant the modeling or
projections done by lenders or borrowers, the negotiation
history between the parties, the assumptions of the parties
about the likelihood of future events, and the "prior
performance of similarly structured floating-price convertible
loans made by a lender."  Id. at 340-41.

A threshold question in this bench trial is whether Adar
Bays has retroactive effect and governs the Notes, each of which
was issued and amended before the New York Court of Appeals
rendered its opinion in Adar Bays.  In New York, "it is well
established that, consonant with the common law's policy-laden
assumptions, a change in decisional law usually will be applied
retrospectively to all cases still in the normal litigating
process."  Gurnee v. Aetna Life & Cas. Co., 55 N.Y.2d 184, 191
(1982) (citation omitted).

> As an exception to this general rule, however, where
> there has been such a sharp break in the continuity of
> law that its impact will wreak more havoc in society
> than society's interest in stability will tolerate[,]
> a court may direct that the new pronouncement operate
> prospectively alone.

Id. (citation omitted).  "A judicial decision construing the
words of a statute . . . does not constitute the creation of a
new legal principle" for the purposes of assessing
retroactivity.  Id. at 192.  This principle applies to judicial
interpretations of criminal statutes as well.  See People v.
Hill, 85 N.Y.2d 256, 262 (1995).

In Adar Bays, the New York Court of Appeals interpreted
what constitutes interest under the New York usury statutes.
The court did not state that its ruling would only apply
prospectively.  Accordingly, Adar Bays applies to the Notes.

B.   Application

VNUE does not contend that any of the four 2017 Notes, as
originally executed, charged a usurious interest rate.  VNUE
argues, however, that both of the 2018 Notes, as originally
executed, charged a criminally usurious interest rate due to
their OIDs.  VNUE asserts as well that all of the Notes with a
floating-price conversion option ("Floating-Price Conversion
Notes") are usurious due to the conversion option.  That
conversion option is contained in the First and Second
Amendments to the Original Notes and in the 2019 Note.  This
latter argument will be addressed first.

1.   Floating-Price Conversion Notes

VNUE has failed to prove by clear and convincing evidence
that the Floating-Price Conversion Notes are usurious.

Specifically, VNUE has failed to demonstrate as of the date of issuance either that any of the Notes carried an interest rate of over 25% or that the Plaintiffs acted with usurious intent.

i.    Usurious Interest Rate

None of the Notes contains on its face a usurious interest rate even when the floating-price conversion rate is considered. The base interest rates for the amended Notes was 10% per annum; it was 12% per annum in the 2019 Note.  While the conversion discounts in the amended Notes and the 2019 Note range between 50% and 60%, and the Plaintiffs had the right to convert the amended Notes "at any time," the rate at which they would seek to convert the Notes was not known at the time of the issuance.[10] There is no record evidence to support a finding that the Plaintiffs would have or indeed could have immediately or even in the near term converted the entirety of the debt represented by even one Note into equity.  There was no modeling or projection done by the parties to support such a finding.  And nothing in the negotiation history between the parties suggests that was likely or contemplated.  Therefore, any calculation of an annual interest rate incorporating the floating-price

---

[10] The conversion right for the 2019 Note could be exercised at any time during the time period between May 13, 2020 (180 days after the Note's execution date) and the later of August 14, 2020 (the maturity date) or the date of payment of the amount owed under the Note upon an event of default.

conversion option for any of the amended Notes or for the 2019
Note is a complex undertaking.  It would, in fairness to the
parties, require consideration of a rate of conversion and sale
of shares that would maximize the lender's recovery while
avoiding severe damage to VNUE.

To support its contention that the Notes charge a usurious
rate of interest, VNUE has provided expert testimony from Dr.
Hakala.  Dr. Hakala is an expert in business valuation and
financial accounting.  He has used that expertise to opine on
matters relating to shareholder value, tax valuation,
bankruptcy, and economic damages.

Dr. Hakala calculated the interest rates for the Notes as
originally executed, as amended by the First Amendments, and as
amended by the Second Amendments.[11]  He concludes that the
Floating-Price Conversion Notes all have interest rates of over
25%.  He does not contend that the 2017 Notes, before their
amendment, contain usurious interest rates, but he does conclude
that the 2018 Notes were usurious as originally issued when the
OIDs are factored into those Notes.

"[T]he question of what weight to accord expert opinion is
a matter committed to the sound discretion of the factfinder."

---

[11] Dr. Hakala conducted two versions of these calculations: one
that included the amount of accrued default interest in the
calculations and one that did not.  The rates recited here do
not include consideration of the default interest rate.

Clerveaux v. E. Ramapo Cent. Sch. Dist., 984 F.3d 213, 233 (2d
Cir. 2021) (citation omitted).  "A factfinder may certainly
consider the bases for an expert's opinion and may accord the
opinion less, or even no, weight if the record suggests that the
bases are defective, incomplete, or questionable."  Pope v.
County of Albany, 687 F.3d 565, 581 (2d Cir. 2012).

Dr. Hakala relies on an assessment of each Note's
"intrinsic value" and provides the following description of his
methodology: "I have only included 'intrinsic' value associated
with conversion rights and excluded all incremental
'optionality' value for conversion rights as well as granted
warrants from the calculation of interest."  His expert report
explains the intrinsic value method as follows:

> The "intrinsic" value is deemed to be realized on the
> date of issuance and is typically calculated as a form
> of OID for financial accounting purposes.  In this
> instance, in order to be conservative and reflect the
> net cash proceeds of each loan I have not treated the
> "intrinsic" value as a form of OID but, instead, as
> additional consideration.

In measuring the value of the option of conversion, Dr. Hakala
assumed that the principal was converted into shares on the
maturity date of the Note, and that all of those shares were
immediately sold by the lender at the market price for VNUE's
shares that prevailed on that date.

By adopting the intrinsic value method, Dr. Hakala did not
have to determine how many shares the Plaintiffs would receive

21

upon conversion, determine how many shares the Plaintiffs would have been able to sell upon conversion, consider VNUE's financial condition at the time of conversion, or make a prediction about its financial condition in the future.  Nor did he have to consider the number of issued and outstanding shares of VNUE, the dilutive effect of VNUE's preferred shares, or the activity of other VNUE shareholders in the market.  As Dr. Hakala explained, he relied on the intrinsic value method since the current stock price is an "estimate of the probability weighted of all future outcomes."

His report's analysis of the 2019 Note is illustrative. The 2019 Note had a principal of $53,331, a base interest rate of 12% per annum, an OID of $2,500, a floating-price conversion option set at 60%, and a term of nine months.  The floating-price conversion option of 60% gave Golock a 40% discount on VNUE shares upon exercise of its conversion right.  Dr. Hakala states:

> The beneficial conversion discount of 40% is
> effectively another $21,332.4 (not counting conversion
> of interest to shares) of interest which translates
> into 41.97% of the net loan amount and an interest
> rate to maturity of 58.38% annualized.

As Dr. Hakala readily admitted at trial, given the thin trading in VNUE stock, any quantity of shares could only be sold prudently into the market by selling them slowly over a lengthy period of time.  He opined that there was "substantial

volatility" in VNUE share prices.  As VNUE has recently stated
in its 2023 Form 10-K,

> the lack of an active market [of VNUE common stock]
> impairs [an investor's] ability to sell [its] shares
> at the time [it] wish to sell them or at a price that
> [it] consider reasonable.  The lack of an active
> market may also reduce the fair market value of [its]
> shares.

Dr. Hakala emphasized this reality in the market for VNUE shares
in his description of the "toxic conversions" of convertible
notes into VNUE shares that occurred from 2018 to 2020, which
caused the VNUE share price to drop significantly.  The price
fell from $0.0101 per share on September 28, 2018, to as low as
$0.0001 per share during that time period.  These "toxic"
conversions are not attributable to the Plaintiffs, who were
responsible for only a miniscule fraction of the conversions
during this period of time.

       Thus, even though Dr. Hakala's intrinsic valuation model
assumed the immediate conversion by the Plaintiffs of the
entirety of the debt into stock upon a Note's maturity, he
explained at trial that no reasonable lender would do that.
That is, because the lender could not sell immediately all of
the stock acquired by the conversion into the market, no
reasonable lender would immediately exercise its full conversion
rights under a VNUE Note.  A full conversion would lose the

significant advantage provided by the conversion rate if the price of the stock moved against the lender.

Therefore, as Dr. Hakala explained, any prudent lender would opt to convert small quantities of the stock at any one point in time and only in an amount the lender believed it could profitably sell promptly.  This would result in incremental conversions and incremental sales over a lengthy period of time, indeed years, given the amount of the VNUE convertible debt owed to the Plaintiffs.  VNUE presented no evidence whether the costs associated with the sale of this penny stock on such a timetable would have been financially sensible.

Dr. Hakala's opinion is confirmed by the Plaintiffs' experience in trying to sell converted shares of VNUE stock.  At the rate at which Golock converted Notes in 2019, it would have taken over eight years for the Plaintiffs to recoup just the principal they were owed on the Notes.  VNUE has not offered evidence that a conversion of the debt at that rate would have created a usurious rate of interest when calculated at the time the Notes were issued.

Dr. Hakala acknowledged at trial the weakness in his intrinsic value methodology as applied to the thinly traded, volatilely-priced VNUE stock.  He freely admitted that the conversion right would have to be exercised slowly, over a lengthy period of time, and would not result in a rate of

interest of over 25%.  He elided over that problem, however, by
asserting that the default interest rate -- which was 24% for
the amended Notes and 22% for the 2019 Note -- produced a
usurious interest rate for the Notes even if one calculated the
value of the floating-price conversion option as far lower than
he had done.

VNUE has not argued, however, that it is appropriate to
combine the default interest rate with the terms of the Note
that govern prior to any default when calculating the rate of
interest for purposes of the usury statute.  Neither the New
York Court of Appeals nor the Second Circuit in their decisions
in Adar Bays suggests that a default interest rate should inform
a decision on whether the underlying loan carried a usurious
rate of interest.  New York courts treat the question of usury
in the context of the interest rate at default as a distinct
question from whether the loan itself was usurious.  See, e.g.,
Martell v. Drake, 2 N.Y.S.3d 288, 290 (3d Dep't 2015); Hicki v.
Choice Capital Corp., 694 N.Y.S.2d 750, 751 (2d Dep't 1999);
Miller Planning Corp. with Delta Funding Corp. v. Wells, 678
N.Y.S.2d 340, 340 (2d Dep't 1998); see also Manfra, Tordella &
Brookes, Inc. v. Bunge, 794 F.2d 61, 63 n.3 (2d Cir. 1986)
("[T]he usury laws do not apply to defaulted obligations.").
Therefore, Dr. Hakala's admission is further evidence that VNUE

has not shown that the amended Notes and the 2019 Note are usurious.[12]

VNUE has failed to carry its burden to prove usury. It has failed to show that Dr. Hakala's intrinsic value method is the appropriate test to apply to assess whether the floating-price conversion options produced a usurious rate of interest as of the time the Notes were issued.

VNUE argues that the time period over which the Plaintiffs may have intended to or been able to exercise their conversion rights is irrelevant because Adar Bays emphasized that "floating-price conversion options have intrinsic value that is bargained for in these loans." 37 N.Y.3d at 337. The use of the phrase "intrinsic value" in Adar Bays, however, is not an endorsement of the intrinsic value methodology used by Dr. Hakala. In referring to intrinsic value, Adar Bays was confirming that floating-price conversion options have a value to the lender at the time of contracting, and that that value should be "treated as a component of interest." Id.

Critically, as the Adar Bays court cautioned, the possibility that a loan "may" result in a return exceeding 25% does not render a loan usurious on its face. Id. at 334. The

---

[12] Dr. Hakala added at trial that in determining a fair value for the conversion rate, or in determining whether a conversion rate is usurious, an expert assumes that a company will remain public and does not "take into account" the risk of default.

court emphasized that floating-price conversion options should be included in the calculation of interest "to the extent such valuation can be proven by reasonable methods."  Id. at 342. VNUE must demonstrate "by reasonable methods" that the floating-price conversion options for the shares at issue here had a value which rendered the Notes usurious.  VNUE has failed to do so.  VNUE has failed to show that, in the words of Adar Bays, "the real transaction was the loan or forbearance of money at usurious interest."  Id.

> ii.  Usurious Intent

VNUE also fails to prove by clear and convincing evidence that the Plaintiffs intended to charge a usurious rate when the Floating-Price Conversion Notes were executed.  Whitlock never valued the conversion option for any of the Notes.  There is certainly no evidence that the Plaintiffs calculated an interest rate using the intrinsic value method applied by Dr. Hakala, VNUE's expert.  Indeed, VNUE didn't offer any evidence that VNUE itself ever calculated the interest rate for a Note by valuing the conversion options for the Note.

Beyond the absence of any evidence of usurious intent, it is helpful to remember that the purpose of New York's usury laws is to protect vulnerable borrowers from the unequal bargaining power between them and potential lenders.  That situation did not occur here.  The Notes were entered into by sophisticated

businessmen.  VNUE has presented no evidence that the Plaintiffs took advantage of VNUE in the negotiations for these loans.  In sum, VNUE has failed to carry its burden to show by clear and convincing evidence not only that the adoption of a floating-price conversion option created usurious loans but also that the Plaintiffs had usurious intent by extending Notes containing such a term.

        2.   2018 Notes

Even if the Floating-Price Conversion Notes were usurious, the six Original Notes, which did not carry that conversion rate, would be enforceable.  See Eikenberry v. Adirondack Spring Water Co., 65 N.Y.2d 125, 126 (1985).  As a consequence, the Plaintiffs would be entitled to recover the principal and interest outstanding on those Notes.

VNUE argues, however, that the two 2018 Notes charge a usurious interest rate when the OIDs on the Notes are calculated as interest.[13]  VNUE's argument fails.

Whether OID constitutes interest is a question of fact. See Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 594 (1981).  VNUE has not met its burden to prove that the OID in the two Notes constituted interest.  Rather than constituting

---

[13] Three of the four 2017 Notes also included OIDs.  Dr. Hakala concluded that the interest rate for the three Notes remains below 25% even when the OIDs are included in the interest calculations for these Notes.

additional consideration for the loans, the OIDs compensated the Plaintiffs for the expenses of the travel, attorneys' fees, and other costs associated with their due diligence on the loans. The OID, therefore, is not properly included in the calculation of these Notes' interest.  VNUE does not contend that the interest rates for the 2018 Notes are usurious without including the OID in its calculation.

II.  Attorneys' Fees

The Plaintiffs have also requested attorneys' fees.  "In the American system of justice, 'the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.'"  Fresno Cty. Emps.' Ret. Ass'n v. Isaacson/Weaver Fam. Tr., 925 F.3d 63, 67 (2d Cir. 2019) (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975)).  But "parties may agree by contract to permit recovery of attorneys' fees, and a federal court will enforce contractual rights to attorneys' fees if the contract is valid under applicable state law."  U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 74 (2d Cir. 2004) (citation omitted).  "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."

NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 175
(2d Cir. 2008).

The Original Notes contained the following provision
regarding attorneys' fees:

> Collection Costs.  In the event that, upon an Event of
> Default, any amount under this Note is collected in
> whole or in part through suit, arbitration or
> mediation, then and in any such case there shall be
> added to the unpaid principal balance hereof all costs
> of collection, (including, but not limited to,
> reasonable attorneys' fees and expenses) whether or
> not suit is filed.

The attorneys' fees provisions in the Original Notes were
unchanged by the First and Second Amendments.  The 2019 Note
included a similar provision: "If default is made in the payment
of this Note, the Borrower shall pay the Holder hereof costs of
collection, including reasonable attorneys' fees."

The Notes' contractual language providing for attorneys'
fees is clear.  VNUE does not dispute that the Notes permit the
Plaintiffs to collect attorneys' fees from it.  Accordingly,
Golock and DBW are entitled to reasonable attorneys' fees for
its expenses bringing and litigating this action.

## Conclusion

Because VNUE has failed to establish the affirmative
defense of usury, the Plaintiffs are entitled to judgment on
their breach of contract claims.  The Plaintiffs' unjust

enrichment claim is denied as duplicative.   A scheduling order
accompanies this Opinion.

Dated:      New York, New York
            June 1, 2023

                                  _____
                                       DENISE COTE
                                  United States District Judge

**APPENDIX**

2017 Notes

Each Note included a base interest rate of 10% per annum and a default interest rate of "the highest (non-usurious) rate" for any unpaid principal and accrued interest as of the Note's maturity date.  The lender was permitted to exercise its conversion option either at the close of VNUE's anticipated private offering or at any time after six months of the Note's execution date.

- A September 1, 2017 10% convertible promissory note from Golock for $105,000 due June 1, 2018, with an OID of $5,000 and a fixed price conversion option of $0.015 ("Golock Note 1")

- An October 19, 2017 amended convertible promissory note from Golock for $50,000 due June 26, 2018, with a fixed price conversion option of $0.02 ("Golock Note 2")

- A November 13, 2017 10% convertible promissory note from Golock for $36,750 due August 13, 2018, with an OID of $1,750 and a fixed price conversion option of $0.015 ("Golock Note 3")

- A December 20, 2017 10% convertible promissory note from DBW for $21,000 due September 20, 2018, with an OID of $1,000 and a fixed price conversion option of $0.015 ("DBW Note 1")

2018 Notes

Each Note included a base interest rate of 10% per annum and a default interest rate of "the highest (non-usurious) rate" for any unpaid principal and accrued interest as of the Note's maturity date.  The lender was permitted to exercise its conversion option either at the close of VNUE's anticipated private offering or at any time after six months of the Note's execution date.

- A January 18, 2018 10% convertible promissory note from DBW for $35,000 due October 18, 2018, with an OID of $5,000 and a fixed price conversion option of $0.015 ("DBW Note 2")

- A February 2, 2018 10% convertible promissory note from Golock for $40,000 due November 2, 2018, with an OID of $5,000 and a fixed price conversion option of $0.015 ("Golock Note 4")

First Amendments

- Golock Notes 1-4 were amended on November 5, 2018 ("First Golock Amendment") as follows:
    - The principal on Golock Notes 1-4 was increased to $139,504, $63,125, $48,071, and $51,367 respectively, which included the accrued interest due by VNUE as of November 5, 2018
    - The maturity dates of Golock Notes 1-4 were extended to November 30, 2018
    - Golock was permitted to convert the outstanding principal and interest "at any time" into VNUE common stock for a price equal to the lower of (i) $0.015 or (ii) 58% of the lowest trading price of the shares during the twenty prior trading days, including the day on which a Notice of Conversion was received by VNUE or its transfer agent

- DBW Notes 1 and 2 were amended on November 7, 2018 ("First DBW Amendment") as follows:
    - The principal on DBW Notes 1 and 2 was increased to $26,310 and $43,526 respectively, which included the accrued interest due by VNUE as of November 7, 2018
    - The maturity dates of DBW Notes 1 and 2 were extended to November 30, 2018
    - DBW was permitted to convert the outstanding principal and interest "at any time" into VNUE common stock for a price equal to the lower of (i) $0.015 or (ii) 58% of the lowest trading price of the shares during the twenty prior trading days, including the day on which a Notice of Conversion was received by VNUE or its transfer agent

Second Amendments

- Golock Notes 1-4 were amended on April 29, 2019 as follows:

33

- The principal on Golock Notes 1-4 was increased to $142,356, $64,415, $49,054, and $52,417 respectively, which included the accrued interest due by VNUE as of April 30, 2019
- The maturity dates of Golock Notes 1-4 were extended to July 31, 2019
- The conversion discount in the First Golock Amendment was changed from 58% to 50%
- VNUE was required to issue Golock a Common Stock Purchase Warrant for 12,833,333 shares at $0.00475 per share

- DBW Notes 1 and 2 were amended on April 29, 2019 as follows:
  - The principal on DBW Notes 1 and 2 was increased to $27,579, and $45,625 respectively, which included the accrued interest due by VNUE as of April 30, 2019
  - The maturity dates of DBW Notes 1 and 2 were extended to July 31, 2019
  - The conversion discount in the First DBW Amendment was changed from 58% to 50%
  - VNUE was required to issue DBW a Common Stock Purchase Warrant for 2,966,986 shares at $0.00475 per share

2019 Note

- A November 15, 2019 convertible promissory note from Golock for $53,331 due August 14, 2020, with an interest rate of 12% per annum, an OID of $2,500, a default interest rate of 22% per annum, and a conversion price of the lower of (i) $0.0015 or (ii) a floating-price conversion option of 60% of the lowest trading price during twenty trading day period prior to the conversion date; the lender was permitted to convert the principal and unpaid interest during the time period between May 13, 2020 (180 days after the Note was issued) and the later of August 14, 2020 (the maturity date) or the date of payment of the amount owed under the Note upon an event of default